Good morning, Your Honor. Jeff Ryan appearing for the appellant. Let's get everybody up here and seated so they can have a chance to write in their notes as you're talking. We appreciate your willingness to get right up here and get at it. Thank you. And I'd like to reserve three minutes for rebuttal. I do understand that rebuttal might be eaten into by our questions, right? I do. All right. Okay. Your Honor, Appellant Fox first wants to dispel any notion that he was avoiding two minor issues raised by Apelli International in their brief. The truth is that neither argument was even mentioned, let alone relied upon by the district court in its order granting summary judgment. The first argument is International claims on page 55 through 50, 53 through 55 of their brief that Fox, quote, implicitly challenged the outcome of local 24's October 27th officer elections. They argued that an implied challenge is barred by 403 of the LMRDA, which makes suit by the Secretary of Labor the exclusive remedy for challenging union election results. When International floated this argument in the district court, Fox pointed out that, in his opposition to summary judgment, that the prayer set forth in the Second Amendment complaint is precisely the same as set forth in the Casampang case, where this Court clearly said that Title IV of LMRDA does not bar an election-related tort claim filed pursuant to Title I. The second argument is that, in the case of Casampang, there is no reason to believe that the court should not have found that reasoning by the court may be found at 269, Fed 3rd, 1042 at 1063. 1063, that's the Ninth Circuit, 2001. As the Court may know, we relied on Casampang in our opening brief discussing our retaliatory discharge. Do you think those are the best issues? No. That's why we didn't address them in the reply. Okay. Well, I'm thinking you ought to get to your best issues. You're the appellant. Okay. Thank you. And the same thing with the intentional interference with prospective economic advantage. I understand. I think you ought to get to your best issues. My worry is that I shouldn't even be looking at some of these claims because they arise under the local bylaws and the Constitution. Okay. Then your concern is on preemption. It is. And that would only apply to the first, second, and potentially the fifth claims. That's correct. And the only one of those three that there's any reference to the international Constitution is the first cause of action. Well, as I understand it in reviewing the complaint, there was one claim. I was elected to a three-year term, and I ought to get it. That has all to do with the Constitution. Another claim, I made payment, and under the local 24 bylaws, there's a timely payment. That, again, relates to the bylaws. Third claim, you assert deprivation of rights under the Constitution and bylaws as to 1, 2, and 5. That has to do with the Constitution and bylaws. And then you say they were he was assured he would remain in office, therefore a violation of the Constitution. That's right out of the complaint. Right. The first cause of action of the complaint for breach of the implied in fact contract, that he could only be terminated for causes. So you'd agree, then, that at least as to the first cause, that it is preempted? Yes. But not as to the other causes. Then we're really talking, then, about the doctrines of estoppel or waiver or maybe selective enforcement or retaliation? No. Well, I am arguing that, but I'm also arguing that you do not need to look at the case, let alone interpret it, for the second and the fifth causes of action, because you can look at Felicia Castillo's declaration where she sets forth in a party admission what her understanding of when the dues were due. No, but the honest truth is what she says or what she doesn't say doesn't have a whole heck of a lot to say about anything unless I can read the local bylaws or the Constitution to determine the whole of what she has to say. Well, I respectfully disagree, Your Honor, because she's setting forth, she's quoting from the bylaws in her declaration, and she's citing for the sections of her, of the bylaws in her declaration, and she's saying this is how these rules apply. And that's exactly how Mr. Foxx. Just because she says it, I mean, if I have to determine it, I have to first of all determine whether what she says has any applicability or not, and then I have to determine whether the Constitution or bylaws say something else. And the bottom line is I've got to apply the Constitution and bylaws. I've got to look at them. I've got to review them. And I think that's a preemption. Okay. Let me cite to the Kramer case, which is cited in our brief. It's 2001. It's a, I'll give you this. It's 255 Fed Third. I've got the Kramer case. Okay. Thank you. It says, Moreover, the court held that a defense based on the terms of a collective bargain agreement is not enough to require preemption. None of our causes of action, the first, well, the first we've agreed to, but the second or the fifth, do not require looking at the Constitution whatsoever, let alone interpreting it. It's the defense to our claims that they breach the implied covenant of good faith and fair dealing by ousting him is the essence of that claim. The fifth claim is for intentional interference with prospective economic advantage. And again, you don't have to look at either of the bylaws for that. Those, what happened in the lower court is that they relied on it as a defense. And in the Kramer case it says, Moreover, the court held that a defense based on the terms of a collective bargain agreement is not enough to require preemption. A defendant cannot, merely by injecting a Federal question into an action that asserts what is plainly a State law claim, transform the action into one arising under Federal law, thereby selecting the form in which the claim will be litigated. That's exactly what happened here. They've raised the issue of dues payment and they've raised the issue of the conflict between the international constitution and the local bylaws into this litigation. We're not, in the second or the fifth cause of action, asserting either one of those. We're saying that by these actions, by firing him, publicly humiliating him for exercising his right of free speech, to speak out about the local leaders, their handpicked successor who was white male and Mr. Fox was a Latino male, all of these things, the internationals negotiating the sweetheart deal with Bodine Bakery. None of that has to do with whether his dues were on time or not on time. It's the defense that brings in. Well, I guess I'm still having trouble based on Young, because it seems to me that Young, and I'll read you the language. I didn't know whether you wanted me to take the time. The implied covenant tort is designed to protect the job security of employees who, at common law, could be fired at will. Generally, no comparable lack of job security exists for unionized employees, quoting Young. Then, analysis must focus on whether the state tort action for breach of duty of good faith as applied here confers non-negotiable state law rights on employers or employees, independent of any right established by contract, or instead, whether evaluation of the tort claim is inextricably intertwined with the consideration of the labor contract. There's no question under Young that the California's implied covenant is inextricably intertwined with the consideration of the terms of the labor contract. So, therefore, here I am, again, back to the Constitution, back to the bylaws. Your Honor, I would ask you to re-read the Levidius case, the Supreme Court case. There they said, We underscored the points that Section 301 cannot be read broadly to preempt non-negotiable rights conferred on individual employees as a matter of state law. And we stress it is the legal character of the claim, as independent of rights under the collective bargain agreement, that decides whether a state cause of action may go forward. Finally, we were clear that when the meaning of the contract terms is not the subject of dispute, the bare fact that a collective bargain agreement will be consulted in the course of state litigation plainly does not require the claim to be extinguished. Why wouldn't the statute of limitations then apply in this particular argument? You do not argue in your opening brief that if 301 LMR preempts the state law claims, the district court erred in applying a six-month statute. You filed your complaint in December 2008, 14 months after the conduct in October 7. I think there might be a disconnect between you and I, Your Honor. We agree that if this – if the three state law claims are preempted, the statute of limitations bars the claims. We agree with that. What we're saying is they're state law claims. They're founded on state law. They're independent of not the collective bargain agreement, but the bylaws in question here, which is the only one that applies, and there's a two-year statute of limitations for these claims. So they're not time-barred. I'd also like to move to the other claims. Yes, Your Honor. Pretty much the only argument that they raise in terms of the retaliation claim, which is, I believe, the fourth cause of action under the LMRDA, is that they didn't have to give the procedural safeguards to Mr. Fox because this was a, quote, the exception to the rule which says that they – it was a nonpayment of dues case. This is not a nonpayment of dues case. It never was a nonpayment of dues case. At the time the letter was sent by the International to Felicia Castillo via e-mail on October 12, 2008 – 7, excuse me, it was – Mr. Fox was current on his dues. They had accepted the payments in September, the two payments in September, and under the reading of the bylaws and Felicia Castillo's and Mr. Fox's understanding of when they were due, they were due on the last day of the month following. So as of that date, there was no dues arrears, let alone a nonpayment of dues. That rule applies when an action is taken against somebody that hasn't paid the dues, a nonpayment of dues. At best, what we're talking about here, Your Honor, is a late payment of dues that occurred for the month of July 2007 when Mr. Fox was on vacation and he came back and paid him 18 days late. Do you explain to me factually what exactly happened to him? There was an election and he wasn't allowed to run for the election for a business agent? Yeah. It's a two-step process to be elected to an office in Local 24. Step number one is you have to be nominated. The events that occurred here was the nomination meeting in October 16, 2007. At that time, he was current in his dues? Yes. So I don't understand, then, what the retaliation was. He was current in his dues, but he wasn't nominated. What's wrong with that? He was fired, Your Honor. Not only was he not allowed to run for election as a financial secretary, the open position that Felicia was in. So your claim is that notwithstanding the fact that he had paid up his dues and he was current in his dues, he was nonetheless penalized and retaliated against, so to speak, by not being allowed to be a candidate for re-election because of his prior failure to pay his dues in a timely fashion? I just want to understand exactly what you're talking about. That's one aspect. And the other, he was fired from his job. His job didn't even end as business agent. That he had another six to nine months in that position. He was not allowed to complete his term of office. When was he fired from his job? And you were talking about business agent on the one hand, that he also was terminated from his employment? Yes. At the same meeting, at the pre-nomination meeting on October 16, 2007, Felicia Castillo publicly humiliated him by reading out loud and passing out to everybody in the meeting a letter that was issued by the State. And at that time, he was terminated from his employment? Yes. And asked to leave in 48 hours. And he was current with his dues. That's right. And that's the basis for your retaliation. No. The basis for it, that is the ultimate act of retaliation. But they were retaliating against him because he exercised his right of free speech to question the leadership of the local union on a number of matters. And they didn't like him. The international wanted to get rid of him. And this is the only business agent in the country that's ever been terminated, ever been terminated in office. And he was only 18 days late on one $47 payment. This is pretext, Your Honor. Thank you. So why is his discharge from his employment, as well as the fact that he was not allowed to run again for business agent, not pretextual, and therefore subject to jury exploration at a trial if he was current in his dues? Let me explain the employment and the business agent relationship. They're actually one and the same. So his employment was with Local 24 as a business agent. So if you're not a business agent, you automatically are no longer going to be employed,  That's correct. That's correct. That's correct. So under the international constitution, in order to continue to hold office as an elected business agent, you must maintain your good standing. You lose your good standing. Wasn't he in good standing at the time of the nomination? He had paid up his dues, right? Under the local bylaws, you don't reinstate your good standing until a month after you've paid your dues. But in any event, the international constitution provides that in order to be eligible to run for office, you have to have maintained your good standing for the previous two years. So if he lost his good standing a year earlier and was in good standing at the time of the nominations, that would be irrelevant. Isn't that the pretext issue? Because from my understanding of the record, there's a long history here of people who have paid up their dues and they were restored to good standing. Should not, you know, a fact finder be entitled to listen to all of that to see which side of the law it flops on? There is, of course, a procedure to restore good standing. The restoration of the good standing is not the issue here. The issue is was he properly suspended and what were the consequences of the suspension. He was properly suspended because he was late in paying his dues. But business agents in the past have failed to pay their dues. They still did not lose their position as business agents. There's no evidence in the record to support that assertion. There's none whatsoever. A plaintiff had an opportunity to do depositions and discovery, to discover his position. Your position is that if somebody doesn't pay his $47 dues, he's out. If he doesn't pay it in time to avoid suspension, under the international constitution, which the local is bound by. Can I say this again? Yes. He failed to pay his $47, but he pays it up a month later. He's late in his payment. That's not sufficient. That by itself, what you just described, being late in the payment of one month's dues will not trigger suspension. The lateness has to be two months late in order to trigger a loss of good standing and therefore a suspension. Anybody who's a business agent who has been in default for two months is automatically  That's correct, Your Honor. That's your position. And that rule is applied by the international to which the local is bound. Don't you think there should be some sort of factual exploration of that, whether or not that's consistently practiced? I mean, isn't there an issue of fact here? Should they not be allowed to raise the pretext issue as a factual matter? The case is before you, Your Honor, on an appeal from summary judgment, and defendants moved for summary judgment and presented evidence to the court showing that this rule had been consistently applied. The burden shifted to the plaintiff to then come forward with evidence to the contrary, and he failed to do so. But he hasn't satisfied that burden. That's correct, Your Honor. As I understand it, now you can correct me if I'm wrong, is there any evidence that there is anything other than the mechanical procedure that is in place that caused his removal? No, Your Honor. Even on summary judgment, there was no evidence presented by plaintiff that other than the mechanical procedure that's already in place, he was then terminated. As a result of mechanical application of those rules. Which document? Which clause of the which document was exercised on this suspension? Well, there were. The two-month delinquency of the July dues. There were, under the international constitution, and I would note that I'm representing the local here, and Mr. Freund will be speaking further for the international, but under the international constitution, Article 19, Section 6 addresses this issue in terms of losing elected office upon not maintaining good standing, and not maintaining good standing results in suspension. Is that self-executing? If the time goes by, then the suspension just happens? Does anybody have to act on it? Yes. Officer, agents of the unions have to communicate the information to each other and then apply the rules. So it's not automatic in the sense of the Gibson, Dunn, and Crutcher calendaring system, but, yes, someone has to feed the information into the system. I understand that you rely on this automatic process, so to speak, right? But can anybody ever get back into good standing and still be a business agent who has two months in arrears or one month in arrears? I'm not clear about that. How do you get back? I want to give an equivocal answer on that. I don't believe so, Your Honor, but that would be under the international constitution. I'd like to defer that question, Mr. Freund. I don't believe that. Why the heck pay back your dues? It doesn't matter at all. You're out, right? Well, once you've been – if you're not a business agent, if you're a rank-and-file member of the union, you can go suspended and then you want to reinstate your good standing so you can continue your employment at a bakery, for example. There are also members of the union who aren't currently employed but want to maintain their membership in the union for whatever reason, continue to participate in membership activities. Here we have not simply a rank-and-file member, but a business agent who's subject to the special rules of the international constitution for maintaining that office and also being eligible to run for election. So he hasn't paid his dues for two months. He's automatically out as business agent. It's as simple as that. It's as simple as that, Your Honor. And I would like to, unless there are further questions for me, defer the remaining time to counsel for the international. Thank you. Are you going to take the preemption question up? Mr. Freund is our preemption expert here this morning, Your Honor. Thank you. Good morning, Your Honor. Jeffrey Freund for the International Union. I'll take the preemption issue up. If you have any questions, I took from Your Honor's inquiry that you understood our argument. I did understand the argument. I guess now I want you to explain the two cases that counsel suggests I should look at. Because I've already looked at them, but I want to make sure, because if you don't give me good explanation, I'll ask you some questions. Sure. Both of those cases stand for the unremarkable proposition that a case, a State law is preempted, or a State claim is preempted if it is substantially dependent upon an underlying Section 301 agreement. And as Your Honor's questions made clear, the claim here is substantially – all three claims are substantially dependent upon the underlying Section 301 agreement. It has nothing to do with our defense. In order to determine what job security rights, really, that's what this is about. In order to determine what job security rights an officer-slash-employee of a local union has, the one place and only place one can look to to answer that question is the international constitution and the local bylaws. The cases that appellant has relied on stand for, again, the unremarkable proposition that if there is an independent, non-negotiable State-conferred right that provides rights to the world at large, having nothing necessarily to do specifically with the employment relationship or nothing having to do with an employment relationship under Section 301, that those kinds of claims are not preempted. So there are a number of preemption cases in which the courts have – the Supreme Court has preempted a case that an employee was discharged for, for example, filing a workers' compensation claim, which was independently protected under State law, or for refusing to fill up a canister of petroleum in a way in which he thought was an unsafe way. An independent State law protected employees from termination from employment for those reasons. That's not this case. This case is all about whether Mr. Fox was entitled to continue to hold his position. And under the International Union Constitution, which is the only document, the only document coupled with the local bylaws which are consistent with the International Constitution, those are the only documents which describe those rights. Let me ask you. If an officer comes back from vacation and discovers he's late on his dues, and he sends in a check, and the check is received in cash, is that automatic suspension that is constitutionally, in effect, waived or recovered or forgiven, or what happens? No, Your Honor. The fact that somebody is late in their dues and becomes suspended as a consequence of that doesn't, and loses employment as a consequence of that, doesn't mean that he doesn't still owe those dues. So the payment of those dues were still due an owing, and the payment of those dues would have occurred in the normal course. But the bylaws are clear. To answer Your Honor's question, the bylaws are absolutely clear and unequivocal on this point. Page 200 of the record is the International Constitution, and it reads, Members in arrears with dues and or assessments more than two months shall be suspended by the local union to which they belong, as well as by the international union. Suspension shall mean the loss of all local and international union privileges and benefits and of all rights to participate in local proceedings. And then with respect to officers, at page 197 of the record, the Constitution provides, Successful candidates for local office shall continue to meet the requirements of good standing membership as a condition to retaining the office to which elected, and failure to do so shall immediately terminate the term of office, and the local union shall arrange for the election of a successor. The rule is clear. Your Honor may believe it's harsh. I understand that. But the rule is clear and unambiguous. And I would note, having done this work for 30-some years, it's not an unusual rule in a union constitution. Indeed, it's quite a typical rule. I guess my concern is whether it was consistently applied, and there's nothing in the record that suggests anything to the contrary. That's exactly right. The evidence, and now speaking plainly for the international union, the evidence is this, the only information that the international union has with respect to members or officers' payment of dues comes from reports that are submitted by the local unions because dues are paid by local unions. Those reports are submitted to the international union. The international union processes those reports through an automated software processing program. And when there is, and the software program notes anybody who's been suspended. When one of the persons who has been suspended for non-payment of dues for two months is an officer, the software program triggers another little piece. That little piece notes that an officer was two months in arrears and therefore suspended pursuant to the bylaws. And that results in the sending of a letter to the local advising the local officer that the local president that the officer has been suspended. Is there any mechanism for giving this person a job? Well, he can still work. He can still work in the bakery. This has nothing to do with employment in the industry in which the union represents employees. This has solely to do with serving as an officer of the union. And I must say the notion of regular payment of dues for an officer of a union, again, is not a particularly remarkable proposition. But the notice then goes to the local union president and advises that one of the local's officers was suspended for non-payment of dues. There's no automatic dues check-off for an officer. I'm sorry? There's no automatic dues check-off for all officers. There isn't in this local. It may well be that other locals have those provisions, but there isn't in this local. The letter that was triggered in this case was identical to hundreds of letters that get sent by the international union all the time. And the punchline of the letter is, if the information we have is wrong, tell us so that we can correct it. And that is 100 percent of what the international union did in this case. All it did was follow its normal automated procedures, applying the bylaws by their terms. On your precise question, there is not a shred of evidence, not one shred of evidence that any union officer anywhere in the country ever was treated any differently. I understand that. What if he was one day late and he were to make a difference? Your Honor, here's the problem with that. It would be very nice and easy to say, oh, if somebody is one day late, then we ought to just waive the rule. But then the next person comes along and is two days late, and then the next person comes along and is three days late. Bright lines have consequences. Sometimes they're harsh. Your Honor, as a district judge and Your Honor sitting in the court of appeals, have to apply bright lines all the time. The Constitution sets the bright line. The law is clear that a union's reasonable interpretation of its bylaws is entitled to great deference. And there is nothing in here to suggest that the union has ever deviated from this rule, has ever applied it differently to anybody else. Or that the rule is an unreasonable one. So the answer to your question is, if he's one day late, and he is one day late, and one day late puts him in a suspension position, and under the bylaws which were adopted by the union at its conventions in the normal course of governance, then the rules apply. Now, I want to answer one more of your questions, Your Honor, because I understand your concern about the harshness, the apparent harshness of this rule. You suggested that if someone were two months late in his dues and therefore suspended, he could never again serve as a local union officer. That's not correct. The bylaws or the Constitution provides that in order to run for office, a union member must be in continuous good standing for two years next prior to the date of nomination and election. So there would have been nothing precluding Mr. Fox or any other officer in his position from reestablishing his good standing, reestablishing that good standing for two years and running two years later again. Exactly correct. If Your Honors don't have any further questions. I think your time has expired. Yes. Thank you very much. Thank you, Your Honors. There's nothing mechanical about suspending and firing a business agent, and it's certainly not in two months. It's not automatic, as counsel said. If you look at my brief, reply brief at page 13, in 2002, under exactly the same circumstances, the international sent a letter to Felicia Castillo, the local financial secretary, and the last sentence of the letter says, however, if an error has been made or if your local union believes there are circumstances justifying the eligibility of Brother Fox to hold local union office, please advise the international in writing, and we will take the request into consideration. But he paid his dues then. That was a mistake, if I recall, right? That's what they say. We say no, and the testimony from Mr. Fox is before this Court, okay? More importantly, that's what she did. She made it up. She made up an excuse, because at that point he had not voiced his opinions against her handpicked candidate, Joe Berenger, okay? But we also have before the Court, if you look at the supplemental excerpts of records submitted by the International, page 26 of Mr. Fox's depositions, lines 11 through 20, it says, It is a common practice employed by local union heads around the country to take care of officers of their local union who miss their dues payments in some way with the international union. That's the question. Answer. I've been told by several secretary treasurers around the country that it is a common practice within their locals and other locals that they have never heard of somebody being losing their position because of that, that it would be taken care of. So that is a, you know, and Mr. Fox was with the union for 27 years. In addition, in my reply on page 8, it's a- Can we read that? Would you tell us the page, and we'll read that because you're out of time. I cut my time short on that. You're nonetheless out of time. Okay. 20 minutes, 29 seconds over. Okay. Thank you, Your Honor. Thank you. Case 10-15511, Alejandro Fox v. Bakery Confectionery Tobacco Workers and Grain Workers is submitted. Case 10-15654, Peralta v. City and County of San Francisco has been submitted in the briefs and therefore has been deemed submitted. Thank you. That concludes our calendar for today.
judges: Block, Goodwin, Smith N. R.